GENERAL TERM, OCTOBER, 1887.

[CONTINUED FROM PAGE 1.]

## T. J. DEAVITT, ADM'R OF BETSEY GIFFORD'S ESTATE, *v.* A. E. JUDEVINE AND OTHERS.

### *Mortgage.*

1. In case of several conveyances of parcels of land incumbered by a common mortgage the parcels are held to the duty of redemption in the inverse order of their dates; and this rule is applied in adjusting the rights of successive grantees. Thus, the owner of a farm with a mortgage on it conveyed the west half to one party by warranty deed and received pay therefor; *Held*, that as between them, the mortgage was shifted at the time of the severence on to the east half of the farm.

2. Such owner subsequently conveyed the east half to another party, whose title came to the orator's intestate; *Held*, that she took only the title of such owner incumbered with the whole mortgage, as she purchased with notice, and was bound to know the law of contribution. And the rule is not varied by the fact that the first purchaser executed a mortgage on his portion of the farm to the original owner to secure a loan of money; nor by the fact that the present owner of the west half took collateral security to make good his grantor's covenants.

BILL to foreclose a mortgage. Heard on the pleadings and a special master's report, March Term, 1887, Washington county, VEAZEY, Chancellor.

Decree that the bill be dismissed with costs. The bill was brought to foreclose the Davis mortgage, mentioned in the opinion of the court. The master found:

"On the 3d day of February, 1860, P. G. Wood and Eunice Wood, who were the owners of lot No. 59 in the first division of lands in Wolcott, by their warranty deed of that date, conveyed said lot to E. M. Gifford and therein warranted that said premises were free from incumbrance except, as stated in said deed, a mortgage to Jacob Davis, which said Gifford was to pay, on which was due $609. On the 17th of September,

1864, said Gifford by warranty deed, in consideration of $500 then paid to him by Joseph Gilchrist and his wife, Irena L. Gilchrist, conveyed to said Irena that part of said lot No. 59 which was west of the highway which ran north and south through said lot. On the 23d of November, 1865, said Gifford and his wife by warranty deed conveyed to Leroy Plummer and James T. Robbins that part of lot No. 59 which was on the east side of said highway. On the 21st December, 1865, said Plummer and Robbins by quit-claim deed conveyed the east part of said lot to Betsey Robbins, who afterwards married Ira Gifford. On the 21st of April, 1866, said Joseph and Irena Gilchrist mortgaged the west part of said lot to E. M. Gifford to secure the payment of notes then executed by them to said Gifford to the amount of $400.

In 1868 said Gilchrist and wife being unable to redeem their premises 'from said mortgage to Gifford, who requested payment, agreed with the defendant, Judevine, that he should advance the money in their behalf and pay off the the the Gifford mortgage and take a deed of the premises from Gifford and that said Judevine should hold said premises as his security for what said Gilchrist and wife should be owing him for said advances and other debts, and that they should have a right to redeem said premises upon payment of their indebtedness to Judevine. In pursuance of this agreement said Judevine advanced the money for them, and on the 15th of May, 1868, they deeded said premises by quit-claim deed to E. M. Gifford, but remained in possession the same as before with a right of redemption and they procured the discharge of the Gifford mortgage, and on the 29th of December, 1868, said premises were by warranty deed conveyed by Gifford to Judevine who shortly after gave Joseph Gilchrist a bond for a deed of said premises. Gilchrist and wife were informed by Gifford at the time he deeded the land that there was no incumbrance on the premises, and they had no knowledge that there was a subsisting mortgage on lot No. 59 in favor of Davis, until 1871, when they informed Judevine, and he brought a suit against Gifford upon a breach of the covenants in his deed and put a writ in the hands of one Bridgeman, a sheriff, who did not serve the writ, but without authority from Judevine took from Gifford as collateral security for Judevine's protection against the Davis mortgage, a note for $756.58, dated January 3, 1871, and signed by I. J. Currier and Jennie R. Currier, and the sheriff, in behalf of said Judevine, executed a receipt

to said Gifford. Two of the defendant's witnesses testified on cross-examination that they thought Betsey Gifford did not know of the Davis mortgage until it was foreclosed.

" Bridgeman thereupon delivered the note to Judevine and they both then thought the note was good, although the mortgage given to secure it was a second mortgage. At that time Gifford had no known attachable property sufficient to have enabled Judevine to have secured his claim by attachment. Judevine afterwards learned that the property mortgaged was not worth more than the amount of the first mortgage and has never been able to realize anything on the Currier note.

" In 1874 a suit was brought to foreclose the Davis mortgage in which suit said Judevine, Ira and Betsy Gifford and Joseph Gilchrist were made parties defendant, and a decree of foreclosure was rendered with a year's time for redemption. Shortly before the time for redemption expired under this decree the orator, who had been engaged by Ira and Betsey Gifford to assist them in raising the money to pay the amount required by this decree, saw Judevine and asked him in behalf of Mrs. Gifford if he would pay the amount of the Davis decree. This Judevine refused to do unless Mrs. Gifford could give him security therefor. The orator then asked him if he would pay one-half the amount of the decree or would realize upon the note turned out to him by Gifford or permit the orator to do so and have the proceeds applied upon the Davis decree; but Judevine refused to do either, saying that the Currier note was turned out to secure him. He offered to let the orator have the Currier note if he would discharge said Judevine from the Davis mortgage. Thereupon Betsey Gifford borrowed of one Cummings the sum of $900 with which to pay up the Davis decree, and she and Ira Gifford executed to said Cummings their note for that sum, secured by a mortgage of her farm in Wolcott, which farm adjoined and included the easterly part of said lot No. 59, and on the second day of June, 1875, said Betsey Gifford paid up the Davis decree and costs, which then amounted to $828.48.

" Judevine at first supposed he would have to contribute toward the payment of the Davis decree in proportion which the value of the west part of said lot bore to the value of the whole, and with this supposition placed a sum sufficient to pay the Davis decree in the hands of Davis' solicitor, under an arrangement with him that if the Giffords did not redeem, Davis, after the decree ran out, was to deed to Judevine.

After Betsey Gifford redeemed, Judevine's money was returned to him. At the time he placed the money in the solicitor's hands he was advised by him that if there was sufficient value in the east part of lot No. 59 the west part would not have to respond toward the payment of the decree, and that the respective parts of the lot would be held liable in the inverse order of the deeds.

" Betsey Gifford died in 1875, and the orator was duly appointed administrator of her estate. When she and her husband executed the mortgage to Cummings there was a prior mortgage on the farm. (In 1876 said Cummings brought a suit against Ira Gifford upon the note he had executed, and judgment was obtained in said suit for the amount of said note and interest and costs, and execution was issued, and quite an amount of personal property belonging to Ira Gifford was sold thereon, but it did not realize enough to satisfy the execution.

" The Cummings note was presented to the commissioners of Betsey Gifford's estate and allowed; but the estate is insolvent unless the orator should prevail in this suit.) The above findings included between the brackets were found upon testimony objected to as being improper and immaterial by the orator.

" There was considerable conflict in the testimony as to the respective values of the east and west part of lot No. 59. The land on the east part comprised a large part of the tillage land of the Betsey Gifford farm, and extended to within about thirty or thirty-five rods of the farm buildings, but has no buildings upon it. On the land on the west side of the lot there is a house built in 1871, and a barn in 1864. I find that the value of the east side of lot No. 59 is $1,000, and that the value of the west side is $800."

*T. J. Deavitt*, for the orator.

The prior incumbrance should bear equally upon each portion according to its value,—the orator paying five-ninths and the defendants four-ninths. 2 Story, Eq. Jur. ss. 477, 1233; *Chittenden* v. *Barney*, 1 Vt. 28; *Payne* v. *Hathaway*, 3 Vt. 212; *Lyman* v. *Little*, 15 Vt. 576; *Gates* v. *Adams*, 24 Vt. 70; *Hollister* v. *York*, 59 Vt. 1.

To have the parcel of mortgaged premises last conveyed first charged with the incumbrance, the mortagor must convey

with deeds of warranty, and the vendees must have notice of
the prior incumbrance at the time of the conveyance. With
such notice, the cases say, the last vendee will exact security
of the mortgagor if necessary. The mortgagors first conveyed
the equity of redemption to E. M. Gifford, who assumed and
agreed to pay the Davis mortgage by words inserted in the
deed. This created a personal liability of E. M. Gifford to
pay the incumbrance. *Davis* v *Hulett*, 58 Vt. 90.

The purchasers from E. M. Gifford had no notice of the
Davis mortgage for a long time after the sale.

When the westerly portion of lot No. 59 came back into the
hands of E. M. Gifford from the Gilchrists in the way it did,
it became liable for the Davis mortgage, and when it was
deeded to Judevine, Judevine stepped into Gifford's shoes to
allow the Gilchrists to redeem from him. E. M. Gifford had
at that time the legal title to the westerly portion, with this
debt, which he had made his own, resting upon it, and the
most the Gilchrists claimed was an equity right to redeem.

Judevine did not use such diligence in collecting the collat-
eral as the law requires. Am. L. Rev. of 1880, 704; *Roberts*
v. *Thompson*, 14 Ohio St. 1; *Lamberton* v. *Windon*, 12
Minn. 232.

When Betsey Gifford paid the decree, in 1875, she became
subrogated to the rights of the mortgagee, and entitled to the
same interest on her debt as the mortgagee would be entitled
to; and if her debt now exceeds the value of her portion of
the mortgaged premises, under any rule she should be entitled
to a decree for the excess.

*J. P. Lamson*, for the defendants.

This case calls for the application of the rule, that when
premises that are subject to a mortgage are sold in separate
parcels to several purchasers, as between such purchasers the
several parcels shall be charged with the burden of such mort-
gage, in the inverse order of the time of alienation. *Lyman*
v. *Lyman*, 32 Vt. 79; *Root* v. *Collins*, 34 Vt. 173.

When Gifford bought the farm, and took his deed, and assumed the Davis mortgage (as the case finds he did), it is in law and equity the same as though he gave the Davis mortgage himself after he took his deed.

When Gifford sold to Gilchrist, if Davis had foreclosed the mortgage, and Gifford had redeemed, he could not have compelled Gilchrist to contribute. The orator's intestate stands no better than Gifford.

The opinion of the court was delivered by

POWERS, J. The rule is well settled in this State that in case of successive conveyances of parcels of land incumbered by a common mortgage, the parcels should be held to the duty of redemption in the inverse order of their dates. *Lyman* v. *Lyman*, 32 Vt. 79 ; *Root* v. *Collins*, 34 Vt. 173.

No confusion will arise in the application of this rule to the case at bar, if the order of events be carefully noted.

E. M. Gifford on September 17, 1864, owned lot 59, on the whole of which rested the Davis mortgage, which he had assumed to pay. On that day Gifford sold the west half of lot 29 to Gilchrist by warranty deed and received his pay in full. The effect of this severance of the lot and conveyance to Gilchrist was as between Gilchrist and Gifford to shift the burden of the Davis mortgage wholly from the west half to the east half which Gifford retained. Had the Davis mortgage been foreclosed in this posture of the title, Gifford's east half would first respond and the west half would be called on only in case the east did not make good the debt.

This equity that compels the half lot retained by Gifford when he conveyed the west half to Gilchrist to first respond to the Davis mortgage arises at the time of the severance of the land and by virtue of the severance. It was the primary duty of Gifford to pay Davis. This duty remained when he conveyed the west half to Gilchrist. Gifford gave Gilchrist a warranty deed which of itself was equivalent between the parties to a discharge of the Davis mortgage from the west half.

November 23, 1865, Gifford conveyed by warranty deed the east half to Plummer and Robbins, the title to which has since come to the orator's intestate. When Plummer and Robbins bought the east half of Gifford, they obtained Gifford's title to that half precisely as Gifford held it. The record showed them the Davis mortgage on the whole lot and the conveyance by warranty deed of the west half by Gifford to Gilchrist. Hence, they bought with notice of the actual state of the title and were bound to know the law of contribution as between the east and west halves.

The order in which redemption from the burden of the common mortgage is decreed, being fixed by the dates of the several conveyances, will continue attached to the several parcels in the hands of successive grantees.

The rule is not varied in this case by the fact that in April, 1866, Gilchrist mortgaged the west half to Gifford to secure a loan of money. This mortgage had no relation to Gifford's deed to Gilchrist. It was an independent transaction. The west half retained its equitable exemption from the burden of the Davis mortgage precisely as it would had this mortgage run to a person who was an entire stranger to the title.

Judevine's title then to the west half is protected to the same extent as it was in the hands of Gilchrist.

The collateral security held by Judevine is not material. He took this to make good Gifford's covenants of warranty in Gifford's deed to him, and in a conveyance to which the orator's grantors were in no sense privies.

The decree below is affirmed, and the cause remanded.